IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL 98 | : : : | CIVIL ACTION |
| *Plaintiff*, | : : | |
| v. | : : | |
| DEMOCRATIC NATIONAL COMMITTEE, *d/b/a Democratic National Convention Committee*, et al., | : : : | No. 17-1703 |
| *Defendants*. | : | |

**MEMORANDUM**

PRATTER, J.                                                                                                JANUARY 19, 2018

### INTRODUCTION AND SUMMARY

"[A] federal court always has jurisdiction to determine its own jurisdiction." *United States v. Ruiz*, 536 U.S. 622, 628 (2002). Is the same true of an arbitrator?

This case presents the question of whether an arbitrator had the authority to decide the arbitrability of a dispute, or if that authority remains vested with the Court. The plaintiff union, Local 98, argues that the parties did not agree for the arbitrator determine the question of arbitrability, so the Court must determine that threshold question. The defendant Democratic National Convention Committee (DNCC) and the defendant news organizations argue that the arbitrator correctly determined his own authority to hear the dispute, and therefore, the complaint must be dismissed. The news organization defendants also contest this Court's subject-matter jurisdiction over the case.

1

The Court denies the motions to dismiss. The Court has subject-matter jurisdiction to hear the case, and the union's complaint properly states a claim that the arbitrator impermissibly determined the arbitrability of the dispute. The Court finds that the arbitrator did not have the authority to decide the question of arbitrability, and therefore that question remains for the Court, not an arbitrator, to answer.

The Court's ruling today is narrow. Much was made in the briefings and oral argument over whether the underlying case before the arbitrator was arbitrable. But a motion to dismiss is not the proper vehicle to reach, much less resolve, that question. The Court can only decide the question of arbitrability on summary judgment, after discovery as to the underlying agreements (or lack thereof) between all of the parties in this case.

Instead, today's ruling only answers the antecedent question of whether the arbitrator even had the authority to determine arbitrability in the first place. Thus, the Court's present ruling merely holds that only the Court, not the arbitrator, may decide the arbitrability of this dispute. Therefore, the parties are instructed to conduct limited discovery on the underlying agreements, and submit motions for summary judgment on those records so the Court may decide if the dispute was arbitrable.

## BACKGROUND

Prior to the July 2016 Democratic National Convention (DNC) in Philadelphia, the DNCC entered into a Project Labor Agreement (PLA) with the Local 98 union to provide "construction, decorating and production activities essential to the" DNC. Am. Compl. ¶ 9. No news organizations were parties to the agreement.

## I. Dispute Resolution Procedures

The agreement outlined an expedited dispute resolution procedure governing any disputes that arose under the PLA. The DNC was fast approaching, so the parties agreed that any labor disputes needed to be resolved quickly if and when they arose. The agreement required that all disputes be logged within two hours of arising by calling the Philadelphia Area Labor Management Committee (PALM). PALM would memorialize the call in a formal grievance, and the parties would meet informally to resolve the dispute within four hours. If the informal meeting did not resolve the dispute, the conflict would be resolved by an arbitrator within 24 hours. An arbitrator was on duty around the clock during the preparations for the convention.

## II. The DNC Dispute

During preparations for the convention, certain media outlets sought to perform electrical work that union workers argued was theirs under the PLA. Rather than waiting for the union to file a grievance, the DNCC filed its own grievance to resolve the situation quickly.[1] The parties' attempts to informally resolve the issue were unsuccessful, so they went to arbitration. During the arbitration, the DNCC, the union and the news organizations agreed to settle the matter. The resulting half-page settlement agreement divided the contested electrical work between the union and the news organizations.

The agreement specifies that the union "reserves the right to pursue its claim for damages regarding the alleged violations prior to July 18, 2016." July 18 Settlement Agreement, ¶ 5. It also preserves the right of the "media organizations . . . to contest any alleged violations." *Id*. This rapid resolution, which postponed the hard questions for a later day, was elected, at least in

---

[1] This preemptive strike functioned much like a declaratory judgment would in a court. Normally, the DNCC would be the defendant, but in the interest of resolving the issue quickly, the DNCC filed the grievance first.

3

part, to avoid the daunting task of interpreting the 72-page PLA with the national convention looming. Effectively, the union agreed to perform work in accordance with the settlement agreement and determine damages later. This stopgap measure allowed preparations to continue and meet the Convention's deadlines. If there were any claims still remaining after the DNC, the parties would sort it out then. The settlement was silent to how such violations could be contested.

### III. The Post-DNC Arbitration

Shortly after the DNC, the union requested an arbitration hearing on its damages claim. Walter De Treux was assigned to arbitrate the case. He determined that the claim was not arbitrable under the PLA. In support of his decision, Mr. De Treux noted that because the DNCC had withdrawn its grievance after the DNC was completed, he could not determine the damages as outlined in the settlement agreement. The "settlement agreement," he concluded, "resolves the grievance fully." Arb. Dec. at 4.

Mr. De Treux effectively interpreted only the PLA, while ignoring the effect of the settlement agreement. He found that, by deeming its grievance "withdrawn," the DNCC extinguished his ability to hear the case, notwithstanding the settlement agreement's language preserving the union's right to seek damages. Given that the union had never filed a formal grievance, and the DNCC had withdrawn its grievance, Mr. De Treux concluded that there was no dispute to arbitrate.

After the arbitrator's decision, the union filed a complaint under Section 301 of the Labor Relations Act against both the DNCC and the news organizations. Section 301, entitled "[s]uits by and against labor organizations," provides that any "labor organization may sue or be sued as an entity and in behalf of the employees whom it represents in the courts of the United States."

29 U.S.C. § 185(b). The complaint alleges that the arbitrator (1) did not have jurisdiction to determine arbitrability and (2) even if he did, his determination that the dispute was not arbitrable violated the essence of the agreement.[2]

## LEGAL STANDARDS

### I. Motion to Dismiss For Failure to State a Claim

A Rule 12(b)(6) motion to dismiss tests the sufficiency of a complaint. Although Rule 8 of the Federal Rules of Civil Procedure requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), "to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests,'" the plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted) (alteration in original).

To survive a motion to dismiss, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Specifically, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The question is not whether the claimant "will ultimately prevail . . . but whether his complaint [is] sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 562 U.S. 521, 530 (2011) (citation and internal quotation marks omitted). Thus, assessment of the sufficiency of a complaint is "a context-dependent exercise" because "[s]ome claims require more factual explication than others to state a plausible claim for relief." *W. Pa. Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010).

---

[2] As explained above, today's opinion only addresses the first of these issues.

In evaluating the sufficiency of a complaint, the Court adheres to certain well-recognized parameters. For one, the Court "must consider only those facts alleged in the complaint and accept all of the allegations as true." *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994); *see also Twombly*, 550 U.S. at 555 (stating that courts must "assum[e] that all the allegations in the complaint are true (even if doubtful in fact)"); *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) ("[A] court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents"). Also, the Court must accept as true all reasonable inferences emanating from the allegations, and view those facts and inferences in the light most favorable to the nonmoving party. *See Rocks v. City of Phila.*, 868 F.2d 644, 645 (3d Cir. 1989); *see also Revell v. Port Auth.*, 598 F.3d 128, 134 (3d Cir. 2010).

That admonition does not demand that the Court ignore or discount reality. The Court "need not accept as true unsupported conclusions and unwarranted inferences," *Doug Grant, Inc. v. Greate Bay Casino Corp.*, 232 F.3d 173, 183-84 (3d Cir. 2000) (citations and internal quotation marks omitted), and "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft*, 556 U.S. at 678; *see also Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (explaining that a court need not accept a plaintiff's "bald assertions" or "legal conclusions" (citations omitted)). If a claim "is vulnerable to 12(b)(6) dismissal, a district court must permit a curative amendment, unless an amendment would be inequitable or futile." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 236 (3d Cir. 2008).

## II. Motion to Dismiss For Lack of Subject-Matter Jurisdiction

A district court can grant a motion to dismiss pursuant to Rule 12(b)(1) based on the legal insufficiency of the claim. *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1408 (3d Cir. 1991); *Kalick v. United States*, 604 F. App'x. 108, 111 (3d Cir. 2015). A suit may be dismissed under 12(b)(1) "where the alleged claim under the Constitution or federal statutes clearly appears to be [1] immaterial and made solely for the purpose of obtaining jurisdiction or [2] where such a claim is wholly insubstantial and frivolous." *Bell v. Hood*, 327 U.S. 678, 682–83 (1946). "[D]ismissal for lack of jurisdiction is not appropriate merely because the legal theory alleged is probably false, but only because the right claimed is 'so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy.'" *Kulick v. Pocono Downs Racing Ass'n*, 816 F.2d 895, 899 (3d Cir. 1987) (quoting *Oneida Indian Nation v. Cty. of Oneida*, 414 U.S. 661, 666 (1974)).

In moving to dismiss a claim pursuant to Rule 12(b)(1), a party may challenge a court's jurisdiction either facially (based on the legal sufficiency of the claim) or factually (based on the sufficiency of jurisdictional fact). *Endl v. N.J.*, 5 F. Supp. 3d 689, 695-96 (D.N.J. 2014). Dismissal under a facial challenge is rare. It is proper "only when the claim clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction . . . or is wholly insubstantial and frivolous." *Medtronic Vascular, Inc. v. Boston Sci. Corp*, 348 F. Supp. 2d 316, 321 (D. Del. 2004) (internal quotation marks omitted). In that circumstance, a court must accept as true all of the allegations contained in the complaint. *Id*.

Where subject matter jurisdiction is "in fact" challenged, the trial court's very power to hear the case is at issue, and the court is therefore "free to weigh the evidence and satisfy itself as to the power to hear the case." *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d

Cir. 1977). In such an attack pursuant to Rule 12(b)(1), "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Carpet Group Int'l v. Oriental Rug Importers Ass'n, Inc.*, 227 F.3d 62, 69 (3d Cir. 2000).

In a factual challenge, the Court is not bound by the pleadings, and may "weigh and consider evidence outside the pleadings." *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014). Where a defendant attacks a court's factual basis for exercising subject matter jurisdiction, the plaintiff must meet the burden of proving that jurisdiction is appropriate. *Id*. But given "the tightly circumscribed definition of these categories, dismissal via a Rule 12(b)(1) factual challenge to standing should be granted sparingly." *Davis v. Wells Fargo*, 824 F.3d 333, 350 (3d Cir. 2016).

## DISCUSSION

Both the DNCC and the news organizations moved to dismiss the complaint for failure to state a claim. The news organizations also argue that the Court lacks subject-matter jurisdiction over the news organizations. The Court will first address the threshold question of subject-matter jurisdiction before discussing the arbitrator's authority to determine arbitrability.

### I. Subject Matter Jurisdiction

Federal question jurisdiction exists over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. For the "vast bulk" of cases, this means that "federal law creates the cause of action asserted." *Gunn v. Minton*, 568 U.S. 251, 257 (2013). The union argues that subject-matter jurisdiction in this case arises under Section 301 of the Labor Relations Act. Section 301, entitled "[s]uits by and against labor organizations," provides that any "labor organization may sue or be sued as an entity and in behalf of the

8

employees whom it represents in the courts of the United States." 29 U.S.C. § 185(b). Such lawsuits must be for breaches of two kinds of contracts: those "between an employer and a labor organization," and those "between any such labor organizations[.]" 29 U.S.C. § 185(a).

However, this lawsuit is between not only an employer and a labor organization, *but also* third-party news organizations not contemplated by the statute. The news organizations argue that their presence in the case extinguishes the Court's subject-matter jurisdiction. But this argument conflates the concept of personal jurisdiction and subject-matter jurisdiction. All parties agree that the Court has subject-matter jurisdiction over the dispute at issue because both the PLA and the settlement agreement are contracts "between an employer and a labor organization." 29 U.S.C. § 185(a). Given that this case arises under the laws of the United States, the Court can validly hear the case.

Federal-question jurisdiction concerns controversies, not parties. That the news organizations are embroiled in a controversy between a union and an employer does not extinguish the Court's jurisdiction. Even assuming, *arguendo*, that the Court has federal-question jurisdiction only over the dispute between the DNCC and the union, the Court undeniably has supplemental jurisdiction over the claim between the union and the news organizations, because it arises from a common nucleus of operative fact. *See United Mine Workers of America v. Gibbs*, 383 U.S. 715 (1966). Therefore, the Court has subject-matter jurisdiction to hear this case.

### II. Arbitrator's Jurisdiction to Determine Arbitrability

"[T]he question of arbitrability—whether a collective-bargaining agreement creates a duty for the parties to arbitrate the particular grievance—is undeniably an issue for judicial determination. Unless the parties clearly and unmistakably provide otherwise, the question of

9

whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *AT&T Tech. v. Comm. Workers of Am.*, 475 U.S. 643, 648 (1986). In other words, the court's role "is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract." *United Steelworkers of Am. v. Am. Mfg. Co.*, 363 U.S. 564, 568 (1960). The question for the Court centers on the consent of the parties to submit to arbitration, because "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T*, 475 U.S. at 648 (quoting *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960)).

Therefore, absent clear language that the arbitrator could determine the question of his own arbitrability, the decision is the Court's alone to make. The Court finds no such clear language in the agreement. The DNCC concedes that the settlement agreement does not explicitly address the question of arbitrability. Instead, it argues that different provisions in the PLA require that the question of arbitrability must be decided by the arbitrator.[3] There are three such provisions in the PLA that could possibly lead to this conclusion, but the Court finds none of them availing.

---

[3] The news organizations take a curious stance on this question. They argue that the court should uphold the arbitrator's decision because the arbitrator correctly determined that he lacked the authority to hear the case. But such an argument presupposes that the arbitrator had the ability to answer that question in the first place. In effect, by arguing that the arbitrator correctly determined his own power to hear the case, the news organizations necessarily commit themselves to the principle that *the arbitrator had authority to hear the dispute in the first place*. This stance directly contradicts the news organizations' argument that they were not parties to the PLA at all and therefore that the arbitrator had no jurisdiction over them. Given this logical inconsistency, and the close analytical reasoning for the two questions, the Court will construe the news organizations' arguments on this antecedent question as coterminous with the DNCC's.

### A. The "Any Dispute" Clause

The PLA provides that "any dispute arising under the . . . Project Labor Agreement" must be referred to an arbitrator. PLA, App. E, B.1. The DNCC argues that this sweeping language, including the phrase "any dispute" encompasses disputes over the question of arbitrability. The Court disagrees that the language is as indiscriminately sweeping as the DNCC contends. The provision's two component phrases—"any dispute" and "under the PLA"—combine to narrow the provision's scope.

#### 1. "Any Dispute" Interpretation

The DNCC argues that the word "any" indicates that the parties meant for "dispute" to extend broadly enough to encompass the question of arbitrability. But even when "any" is used as a "catchall," it does not "define what it catches." *Flora v. United States*, 362 U.S. 145, 149 (1960). The effect of the term "any" depends entirely on context. After all, "a word is known by the company it keeps." *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961). For example, although the federal felon-in-possession-of-a-firearm statute heightens punishments for those previously convicted in "any court," Congress is assumed not to mean foreign courts, because Congress legislates domestically. *Small v. United States*, 544 U.S. 385, 388–89 (2005). Of course, Congress could change this construction by including the phrase "any court in the world." But this observation simply demonstrates the importance of context to the meaning of the word "any." Therefore, contrary to the DNCC's argument, "any dispute" does not broaden the category of disputes that the arbitrator may hear. Rather, it is restricted by the modifying phrase that follows.

### 2. "Under the PLA" Interpretation

The modifying phrase that follows here is "under the . . . Project Labor Agreement." This phrase limits those disputes that an arbitrator has the authority to hear. As used in this sense, the word "under" is a preposition meaning "subject to the authority, control, guidance or instruction of" the object the preposition modifies (in this case, the PLA). *Under*, MERRIAM-WEBSTER DICTIONARY, 2018. The phrase "under the PLA" thus limits the universe of arbitrable disputes to disputes over rights and obligations created by the PLA, but it does not itself create any independent right or obligation. Rather, it simply determines *where* violations of *other* rights created by the PLA are resolved: before an arbitrator. In other words, a contractual phrase permitting an arbitrator to hear "any dispute under the PLA" does not itself create a dispute under the PLA.

Such a phrase also does not give an arbitrator the right to hear any dispute simply because a question *relates* to the PLA or the DNC. For example, the arbitrator could not resolve a dispute at the DNC over a tortious act committed by a union member against a member of the DNCC on the grounds that such a dispute is ultimately related to the PLA. This is because the dispute between the parties arises under tort law, not under the PLA. A dispute like that could arise regardless of whether the PLA exists, and therefore, it is not subject to the "authority, control, guidance or instruction of" the PLA. *Id*. Something only arises under the document that grants the right. Here, the right to have the arbitrability of a dispute determined arises not under the PLA, but under the body of federal law governing contracts between unions and employers.

This rule can be overridden. In the example above, the parties could agree that "any torts between the parties during the DNC are subject to arbitration." But the fact that parties have agreed that an arbitrator must hear disputes "under the PLA" does not *independently* mean that

12

torts must go to arbitration. Similarly, the parties here could have easily drafted the PLA to allow the arbitrator to resolve disputes regarding arbitrability. For instance, the PLA could have said that the arbitrator had jurisdiction over "any dispute between the parties during the convention" or "any dispute relating to the arbitrability of a dispute." But the parties chose to limit the arbitrator's jurisdiction only to those disputes that arose "under the PLA." Therefore, because the dispute over arbitrability (that is, whether the parties relinquished their rights to go to court) arises not under the PLA, but under the common law of contracts, the phrase "any dispute . . . under the PLA" does not "clearly and unmistakably," *AT&T Tech.*, 475 U.S. at 648, evince an intent for the arbitrator to determine the question of arbitrability.

### B. The "Issues Presented" Clause

The DNCC next argues that the arbitrator could determine arbitrability because the parties gave the arbitrator authority to pronounce "only on issues presented to him." PLA, App. E, C.4. The DNCC argues that this language means that the arbitrator could determine all related issues presented to him, including arbitrability. But this reading defies the plain language of the phrase. For example, if a mother tells her son that he may accept "only the candy presented to him," that parental instruction does not give the son the power to decide whether his mother should have offered him candy in the first place. The offering of candy is a power the mother reserved. Moreover, this "issues presented" clause is one of exclusion, not of inclusion. It defines the universe of what the arbitrator *cannot* pronounce on (namely, things not presented to him) while leaving ambiguous the universe of things he *can* pronounce on (such as arbitrability). Therefore, the Court cannot read this clause to mean that the parties have "clearly and unmistakably," *AT&T Tech.*, 475 U.S. at 648, contracted for the arbitrator to determine the question of arbitrability.

13

### C. The "Jurisdictional Dispute" Clause

Finally, the PLA provides that the "Dispute Resolution Procedure will apply to . . . any jurisdictional dispute." At first glance, this text appears to contemplate that the arbitrator may determine his own authority to hear a dispute. But the Court must "[t]ake nothing on its looks; take everything on evidence." CHARLES DICKENS, GREAT EXPECTATIONS VOL II, 127 (1861).

As this case has demonstrated, the "term 'jurisdictional' is not a word of single meaning." *Carey v. Westinghouse Electric Co.*, 375 U.S. 261, 263 (1964). By the Court's tally in this case alone, the parties used the term "jurisdiction" in six different ways throughout briefing and oral argument. The Court must therefore decide what the words "jurisdictional" and "jurisdictions" mean in the context of the PLA. Although lawyers are trained to think of "jurisdiction" in the legal sense—as in "personal jurisdiction" or "subject-matter jurisdiction"—the term is often used in collective bargaining agreements to refer to "work-assignment disputes" between unions. *See*, *e.g.*, *Sheet Metal Workers Intern. Ass'n Local 27 v. E.P. Donnelly, Inc.*, 737 F.3d 879 (3d Cir. 2013) (interpreting collective bargaining agreements that use the word "jurisdictional" as meaning "work disputes"). The DNCC argues that term "jurisdictional dispute" in the PLA encompasses disputes over the traditional, lawyerly sense of jurisdiction—namely, "the arbitrator's subject-matter jurisdiction to decide the question." Such a reading would mean that the parties had unambiguously contracted for the arbitrator to resolve questions of arbitrability.

But the Court must construe terms across the contract in a consistent manner. The PLA, covering 72 pages, uses the term jurisdiction and jurisdictional numerous times. Appendix B, entitled "Jurisdictional Agreements," outlines jurisdiction in the "work division" sense of the word. This section divides the labor between the various groups working at the convention. The

14

Court has not found, and the parties have not cited, a single use of the term "jurisdiction" elsewhere in the contract that does not mean "work division."[4]

When looking at the specific "jurisdictional dispute" provision at issue, the Court concludes that the parties used the word "jurisdictional" to mean "related to work division." The PLA provides that the parties "have addressed and identified jurisdictional issues and rules to govern such issues." However, "[n]otwithstanding the parties' efforts to identify and resolve jurisdictional issues, if a dispute should arise regarding jurisdictions, it will be resolved through the [arbitration] Procedure contained in this document." PLA App. E, B.3. The allusions to "address[ing]," "identify[ing]," and "resolv[ing]" jurisdictional issues must be referencing Appendix B, which outlines the parties' division of labor. Nowhere in the PLA do the parties address, identify, or resolve "jurisdictional issues" in the lawyerly sense of the arbitrator's authority to hear a dispute. Therefore, it would be nonsensical to give "jurisdictional" that meaning here.

The final subsection provides that "if a dispute should arise regarding jurisdictions, it will be resolved through the Procedure contained in this document." PLA, App. E, B.3. This subsection identifies a number of disputes, including disputes over "jurisdictions." Again, the reading of this phrase as a "work dispute" makes sense in conjunction with the rest of the contract. If the parties meant "jurisdiction" in the legal sense, it would make no sense to use the word in a plural form. After all, no reasonable contracting party would think that the arbitrator could determine all legal jurisdictions, such as subject-matter jurisdiction issues for the Court. That the parties referenced "jurisdictions" rather than the word "jurisdiction" evinces a desire to

---

[4] To delineate this more simply, as used in the PLA, the term "jurisdiction" would operate to mean that "X" is to perform work related to, for example, windows, while "Y" has jurisdiction for floors, and "Z" has jurisdiction for ceiling tiles.

use the word as it was used in the rest of the contract—to apply to work disputes. The Court therefore finds that the word "jurisdiction" as used throughout the PLA does not mean the arbitrator's ability to hear a case, but instead means disputes between competing groups as to who may do the work.

Given that none of these clauses convey authority to the arbitrator to determine his own jurisdiction, he improperly determined that he could decide whether the case was arbitrable.

## CONCLUSION

For the foregoing reasons, the motions to dismiss are denied. The parties are instructed to conduct limited discovery on the question of arbitrability, and file summary judgment motions in accordance with the accompanying order.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE